Bernard S. Meyer, J.
In this action the Town of North Hempstead seeks to restrain the commercial use of a building and the maintenance of commercial signs on property which is *394 presently zoned residence A. The present zoning and commercial nse are conceded, but defendants claim the right to continue the use as nonconforming' and counterclaim for a judgment declaring that right. Injunction granted and counterclaim dismissed, without costs.
The property in question is known as 1616 Northern Boulevard, Manhasset, and consists of Lots A, 1, 2, 16, 17, 18 and 19 on the Strathmore-at-Manhasset subdivision map. Northern Boulevard at this point runs generally east and west. The subdivision map was approved May 20, 1936 and was filed in the County Clerk’s office on June 2,1936. It shows Deep Dale Drive running north past an intersection on the west with Old Mill Boad, then curving to intersect the. southerly side of Northern Boulevard tangentially, and then turning south to meet Old Mill Boad again. Lots A, 16, 17 and 18 are enclosed by Deep Dale Drive and Old Mill Boad and form a parcel somewhat in the shape of a flattened oval. Lots 1 and 2 are to the west and Lot 19 to the east of the intersection of Deep Dale Drive and Northern Boulevard. Neither side proved exactly when the installation of Deep Dale Drive was completed, but it is agreed that prior to its installation no intersection existed at the point where it now intersects Northern Boulevard and that it was offered as a public highway in December, 1936 and accepted by the Superintendent of Highways on January 19, 1937.
North Hempstead’s first zoning ordinance was adopted April 20,1929. The map which accompanied it showed a business district along the southern side of Northern Boulevard including the frontage of the property in question. Within a business district, an office building was a permitted use (art. VII, § 2, subd. c). With respect to business districts, article IX, section 10 of the ordinance read:
“ Section 10. Unless otherwise designated on the Use District Maps.
“ (a) * * *
“ (b) Business districts extend one hundred (100) feet back from the street or streets on which they front. Where rear lot line is more than one hundred (100) feet distant from the street line, they may extend back such additional distance over one hundred (100) feet but not over one hundred fifty (150) feet from the street line. On side streets intersecting business districts, business districts extend two hundred (200) feet back from the street line on which the business district fronts.”
With respect to nonconforming uses, the ordinance provided, in article IX, section 1(f) that “ Whenever a district shall here *395 after be changed, any then existing nonconforming use therein may be continued”. On July 10, 1945, the 1929 ordinance was amended and re-enacted. The amended ordinance contains in section 164.3 a provision substantially the same as subdivision f of section 1 of article IX, but no provision corresponding to subdivision b of section 10 of article IX. In April, 1947, that portion of the business district which included the frontage of the property in question was rezoned from business to residence A. Both the original ordinance (art. XI, § 2) and the present ordinance (art. XXI) contain provisions for amendment of the ordinance and of the zoning map which require notice and a public hearing. It is stipulated that from 1929 until April, 1947, no zoning change was made affecting the property. There were introduced in evidence copies of a zoning map prepared in 1936 and corrected to May 1,1937 and of the same map corrected to 1945. The 1937 map was offered to show ‘1 the treatment of that intersection by the Town in its zoning map ” and the court assumes that both maps were adopted in accordance with prescribed procedure, notwithstanding that the broad wording of the stipulation might be considered to indicate otherwise.
On June 10, 1936, defendant Levitt and Sons, Incorporated, applied for a permit to erect a ‘ ‘ community club ’ ’ building. The application stated the location as the “ south side of Northern Boulevard corner of Deepdale Drive ’ ’ and the zone as “ residential A ” and was accompanied by a plot plan showing the building set back more than 100 feet from the southerly side of Northern Boulevard. A club was a permitted use in a residence A district at that time (art. Ill, § 2, subd. g). The application was approved June 11, 1936, and the building was completed August 20, 1936. As erected, its front is 167 feet and its rear is just under 200 feet from the southerly side of Northern Boulevard. From August 20, 1936, to the present time, the building has been used continuously for business offices, until about 1952 by Levitt and Sons, Incorporated, alone, and in more recent years by that organization and its commercial tenants.
A nonconforming use must have been substantial, existing and lawful. Defendants’ counterclaim must be dismissed both because, as will be hereafter shown, the use has never been lawful, and because defendants have not sustained their burden of showing that a substantial loss or hardship would be imposed by restricting use of the building to a use permitted or conditionally permitted in a residence A district under article II of the present ordinance. There is in the record nothing to show that such a use would necessarily impose a pecuniary or eco *396 nomic loss. (People v. Miller, 304 N. Y. 105, 109; Matter of Harbison v. City of Buffalo, 4 N Y 2d 553, 563.)
On the other hand, the town’s prayer for an injunction must be granted.' As to the advertising signs, injunction will issue because the loss resulting from their removal would be “ relatively slight and insubstantial,” because they are tenant’s signs and therefore could not have existed before 1952, because they were erected without a permit and thus illegally, and as to certain of them because the proof showed them to be located not on defendant Levitt and Sons, Incorporated’s property but on the right of way of the public highway. As to the use of the building for offices, injunction will issue because such use has never been lawful.
It is not necessary now to decide whether the statement in the 1936 building application that the building was to be a community club bars treatment as a nonconforming use (see Levy v. Ackerman, 133 N. J. L. 69), nor whether an originally unlawful use which, as a result of intervening factual or statutory changes, becomes legal can be the basis of a nonconforming use (see Rapasadi v. Phillips, 2 A D 2d 451), for section 10 of article IX of the ordinance did not, on August 20, 1936 or at any time thereafter, place the ground on which the building was erected in a business district. This conclusion is not based on the town’s argument that section 10 related only to intersections in existence on April 20,1929, for the testimony of the Building Department Clerk proved a long-continued administrative interpretation to the contrary (that the 200-foot extension provision applied to new intersections if “ the map were changed ”) and the language of the ordinance shows both positively (art. I, § 1, subd. a reads: “ Words used in the present tense include the future ”) and negatively (by the use in at least eight places of the phrase “the effective date of this ordinance”) that the Town Board in adopting the ordinance did not so intend. Nor does this follow, as the town contends it must, from the fact that the building abuts Deep Dale Drive rather than Northern Boulevard, for clearly Deep Dale Drive is a side street intersecting a business district. (A question, not now necessary to decide, does, however, arise whether the entire building could be within the claimed business district, since, it would appear, the 200-foot measurement is to be made “ on ” [that is, along] the side street.)
The conclusion that commercial use was on August 20, 1936, and continues to be a violation is, rather, predicated on the opening clause of section 10: “ Unless otherwise designated on the Use District Maps. ’ ’ Those words must be read as the intro *397 duction to each of the subdivisions that follow. In consequence, the portion of the ordinance on which defendants rely must be read to state: “ Unless otherwise designated on the Use District Maps, on side streets intersecting business districts, business districts extend two hundred (200) feet back from the street line on which the business district fronts.” Under that language, until a new intersection appeared on the zoning map, the 200-foot extension provision could not apply, for until that time, it could not be known whether the map as adopted by the Town Board would establish a different depth for the particular intersection.
The conclusion thus reached accords with the interpretation testified to by the Building Clerk that the provision applied if “ the maps were changed ”. It also accords with the apparent intention of the Town Board in adopting the provision, for in no other way could it maintain control over the zoning function entrusted to it by the Town Law. If, notwithstanding the fact that no intersection actually then existed, approval of the subdivision map were considered the governing factor, the Planning Board by approving the map would be rezoning the side street property. If installation of the street were taken as determinative, the effect would be to permit a property owner to downzone a portion of his property by installing a private street. If acceptance of the street by the Superintendent of Highways were held to effect the change, that official would be exercising a zoning function not given to him. It may not be presumed, in the face of language clearly indicating an intention through designation on the zoning map to retain control, that the board intended so to abdicate its zoning function. It follows that until the intersection was shown on the zoning map, the 200-foot extension provision could not apply and that, therefore, the commercial use of the building beginning August 20, 1936, was unlawful.
Nor was the original violation legalized by the 1937 map on which Deep Dale Drive first appeared as a side street intersecting a business district, for that map showed only the northernmost 50 feet of Lot A within the business district. By including with the business district on the 1937 map only the northernmost 50 feet of Lot A, the Town Board “otherwise designated ” the depth of the business district at the Deep Dale Drive intersection and thus excluded application of the 200-foot extension provision. Defendants’ argument that the 200-foot extension provision automatically extends every business district intersected by a side street ignores the clear provision of the ordinance that there is no extension if the zoning map other *398 wise designates. Nor may it be said that what the 1937 map shows with respect to Lot A is simply the prolongation of the regular 100-foot depth of the business district and, therefore, cannot be considered to “ otherwise designate,” for this argument overlooks the fact that under the first sentence of subdivision b of section 10 read, as it must be, with the opening clause, even the regular 100-foot depth of a business district may be 1 ‘ otherwise designated ’ \ To state the argument another way, “ otherwise ” means both lesser and greater depth designations with respect to both the 100-foot and 200-foot depths, and it is what is shown on the map which under the language of subdivision b of section 10 must govern. The section is merely an aid to interpretation of the map and has no operative effect apart from or in extension 6f what is shown on the map, except with respect to rear lot lines, which, because they are not shown on a zoning map, would be extended by the language of the second sentence unless a statement to the contrary were written on the map. The need for such an aid to interpretation stems from the not infrequent inaccuracy as to scale of zoning maps and the difficulty of translating shading and cross hatching into ground locations. No reason for giving the extension provision automatic effect in the face of the literal language of the opening clause has been suggested, and none occurs to the court.
Thus commercial use of the property was originally and continued to be unlawful. A nonconforming use cannot be based on such a violation. (City of Yonkers v. Rentways, 304 N. Y. 499, 504; Matter of Tarnapal v. Board of Standards and Appeals, 270 App. Div. 857; Rapasadi v. Phillips, supra; 8 McQuillin, Municipal Corporations [3rd ed.], pp. 25, 186, 483-484; Rhyne, Municipal Law, § 32-26, p. 903.)
The town is, therefore, entitled to the injunction demanded in its complaint and to the dismissal of defendants’ counterclaim. Costs will not, however, be allowed.